The United States v. Farrell, also from Maryland, Mr. Coburn. Thank you so much, Your Honor. Good morning. May it please the Court. Good to have you here, sir. Thank you so much, Your Honor. And may it please the Court, Barry Coburn for the appellate, Michael Farrell. With the Court's permission, I seek to reserve five minutes for rebuttal. You got it. Mr. Farrell was a criminal defense lawyer and essentially a solo practitioner. He practiced with another lawyer but basically operated on his own. It was perhaps just one notch up from shoestring sort of an operation. He was practicing that way for virtually his entire career. And he was a criminal defense lawyer in reality, not just in name, which distinguishes this case from our standpoint in critical respects from the Blair case. By that you mean he tried a lot of criminal cases or something? That's exactly right, Your Honor. He tried a lot of criminal cases and the way he functioned in this case, in his interactions with the individuals involved, in particular his interactions with Mr. Harriman, Mr. Foreman, and years ago his interactions with Mr. Nica, who was the kingpin of the marijuana conspiracy that's at the heart of the underlying case here. In those respects, he functioned also as a criminal defense lawyer, which is distinct from the way the appellant in Blair functioned. In Blair, the individual was involved in real estate transactions and all kinds of non-legal activity. Our client was a criminal defense lawyer and a criminal defense lawyer in reality. And the fact that he was a criminal defense lawyer is of critical import from our standpoint in terms of how this case should be analyzed because, as the Court will note, from all the briefs that have been submitted in this case and particularly perhaps amicus. Who did he represent in this underlying drug conspiracy? Well, I concede to Your Honor that there is some ambiguity about that. What we do know is that years ago, I think something like 17 years, before the events in this case that are at issue in 2011-2012, he represented Mr. Nica. He represented him in a number of different criminal cases and continued a relationship, continued to communicate with Mr. Nica. There was nothing subverted about his relationship with Mr. Nica. It was overt, and it was on the record. In fact, he defended Mr. Nica in a criminal case overtly and achieved an acquittal in that case, and that was years earlier. We also know that he represented Mr. Foreman. That, too, completely overt. Represented Mr. Foreman at least. Did you have this case? I did, Your Honor. Represented Mr. Foreman at least in 2009, very possibly before that. We know that Mr. Farrell was one of the very first criminal defense lawyers who surfaced with respect to the government's investigation of what ultimately became known as the Nica conspiracy, what it refers to as the Nica conspiracy. One of the very first witnesses that the government sought to interview in its investigation of the Nica conspiracy, this is years before the Nica indictment is returned, or at least a year before, was Mr. Foreman. And standing between the government and the object of its investigation was Mr. Farrell, representing Mr. Foreman, who counseled, and again, this is all overt. Counseled for the organization? Well. Was he like a general counsel for the whole mess? And, of course, Your Honor, that is precisely the government's theory of this case. That's what I kind of got that he wasn't, and he got involved in the middle of it. Well, that's the way that certainly. He wanted to cooperate, and he's telling them, but don't tell them anything they don't already know. He did say that. And, of course, as Your Honor knows, it's our position that there is nothing remotely inappropriate about that advice. And if, in fact, the advice could be deemed to be inappropriate, it certainly does not constitute a 1512. It doesn't have to be inappropriate. I'm sorry, Your Honor. If any witness is going to talk to the government, they have to tell them the truth or not tell them anything. I mean, you can't get away with lying to them. I mean, that's true. That's absolutely true. That's absolutely true. Absolutely true. You can take the Fifth Amendment or you can tell them the truth. But there is. Those are the options. Lying is not a viable option, and a lawyer can't tell a witness. What Your Honor just said, with respect to that. If a lawyer implicitly tells a witness to lie, he's beyond it. Well, what Your Honor just said, and this, of course, relates to Counts 8 and 9 of the indictment. What Your Honor just delineated is the most critical point that we have to urge with respect to those counts. Because, Your Honor, like I said, and like the Court just said, Your Honor, it could not be more correct that a lawyer cannot counsel the witness to lie. And, in fact, that makes the lawyer complicit in a 1001 violation. Weren't these proper agreements that he was telling them to go in and just don't tell them anything more than they already know? He was telling Mr. Foreman. Was it a proper agreement? Well, from Mr. Farrell's point of view, and this is critically important from our standpoint, Your Honor, from Mr. Farrell's standpoint, he doesn't know that Mr. Foreman has signed a proper agreement. Now, of course, Mr. Foreman had signed a proper agreement. Mr. Foreman, at the time of these conversations that are at issue, was represented by another lawyer. That's Joseph Murtha. He's talking to a represented defendant about the case, and he's giving advice as to what to tell the government to hold out and not be up front with evidence. And, at that time, he's representing the organization. He's the general counsel, the consigliere. Well, to take that – Sounds like obstruction. And, of course, 1512, Your Honor, is an obstruction-related statute. We don't dispute that. But to take – At least they create a factual question for the jury, and at least you got that here, and the jury returned a verdict, which we have to look at in their favor. Well, of course, the verdict does have to be regarded with all inferences in the jury's favor. I agree with that. I do not agree with the fact that there was a legitimate jury question with respect to – You don't think it should have looked at the jury. Well, I think with respect to Counts 8 and 9, our position is that there was insufficient evidence as a matter of law to convict him. And just to take Your Honor's question apart, because I think there were a lot of critical parts in it. First, with respect to the notion that Mr. Farrell – and, of course, this is the government's theory that Mr. Farrell is the consigliere. He used the word that it uses in its opening, in its brief. Or, you know, another way these cases are referred to is the government likes to try them, to the organization. Now, here, of course, there's no organization. I mean, there's no LLC or anything like that. And from our standpoint, there isn't actually evidence from which a jury could have concluded that he acted that way, as the consigliere or as house counsel. But that's not really the issue before the court. The issue before the court, and I'm talking here just specifically for the moment with respect to Counts 8 and 9. The issue here is, did Mr. Farrell do what Judge King just suggested? Did he tell the witness to lie? And that's what's critical from our standpoint, because you can't tell the witness to lie, and certainly, you know, it would be typical. It would be – I mean, all of us who have been involved in proffering witnesses in criminal cases, white collar or otherwise, we've all seen hundreds and hundreds of proffer agreements. They're usually phrased the same way, but not always. And this is critical, I'd suggest to the court. This is a critically important fact. It is possible for a witness to be proffered. A witness can agree to proffer evidence to the government without a proffer agreement at all. And we have testimony about this. There's uncontested testimony in the record to this effect. Uncontested testimony in the record of this case from evidence that we affirmatively presented a defense case to the fact that a witness can proffer without any agreement at all, and moreover, the witness does not have to proffer with respect to a particularly phrased proffer agreement. A witness – and in fact, the government's own witness, Mr. Murtha, said that it was – I'm sorry, I didn't mean to interrupt the court, but I was just going to say, the government's own witness, Mr. Murtha, agreed that it was permissible and possible for a witness to proffer partially. That was all Mr. Farrell said. He said, tell the government what they already know. Now, of course, no one knew at the time what the government already knew. They might know everything that's relevant. But all he said is, tell them what they know. That is not – cannot, as a matter of law, I submit to the court, cannot be construed as an instruction or a suggestion to lie, particularly because Mr. Farrell had never – Don't tell them what they don't know. That's what he was telling. It had to be the same – it had to be taken that way, and the jury took it that way. Don't tell them what they don't know. I don't – well – Don't tell them the truth. Well, I would suggest to the court that those things are not the same. Telling a witness to tell the government what they already know, tell them what they already know, does not mean – Truthfully. I'm sorry, Your Honor? The jury could construe it as don't answer their questions truthfully. I don't think so, Your Honor. As a matter of law, my suggestion to the court – You argued to the jury, I'm sure. I did. And my suggestion to the court is that a jury could not construe it that way, particularly – What if the government had asked that witness an open-ended question, tell us what you know about blah, blah, blah? It would be – What's the person supposed to do with Mr. Farrell's advice then? He would have a number of different choices. The witness, it would be perfectly – What is a proper agreement? A proper agreement – He'd only have three choices. He could only have three choices. Tell him the truth, take the fifth, or lock him. Well, you don't have to take the – Those are the choices. Well, you don't have to take – That's the choices that he has. I don't mean to interrupt, Your Honor, but you don't – Those are the choices. You don't have to take the fifth in that situation. A proper agreement and a communication with the government pursuant to – If they say tell us what you know, you have to tell them what you know. If they say tell us what you know, you could – Good question, Judge Thacker. Just answer it. Agreed, and I'm going to respond directly to Judge Thacker's question. If the government in a situation like that – let's say a witness comes in without signing a proper agreement at all, perfectly permissible, just sits down and the government says tell us everything you know, the witness could perfectly permissibly respond as follows. I'm not going to do that. I'm not prepared to tell you everything I know. It was a proper agreement. Yeah, but Mr. Farrell, Your Honor, didn't know that. Mr. Farrell doesn't know that, Your Honor. This is all done without Mr. Farrell's knowledge. There didn't have to be a proper agreement. There was a proper agreement, but the way Mr. Foreman puts it to Mr. Farrell when he meets with Mr. Farrell in July of 2012 is I'm thinking about it. He lied, okay, which, of course, you know, corporators do every day of the week. He lied and he told Mr. Farrell, in the context of what Mr. Farrell believes, is in any client conversation because he had previously represented Mr. Foreman, he thought Mr. Foreman was coming back to talk to him because what Mr. Foreman said was I'm dissatisfied with Mr. Murtha. I'm unhappy with Mr. Murtha's services. I'm uncomfortable with what Mr. Murtha is telling me. And so he talks to Mr. Farrell about this and Farrell, unbeknownst to him, there is a proper agreement. He says, you know, go in and tell the government what they already know. Perfectly permissible. That's not telling him to lie. There's nothing illegal about it. He could have done that pursuant to no proper agreement. He could have negotiated different language in a proper agreement. I can just tell you, Your Honor, and I proffered this to Judge Titus at the time, at the time this case was tried, you know. If you didn't have to tell him anything more than I already know, why didn't Mr. Farrell just say, well, just don't go? Well, because telling them what they already know can be of significant value to a client. Telling a witness to go in and tell the government what they already know, I mean, you can get cooperation credit under Section 5K1.1 of the guidelines for telling the government only what they already know because what you're telling them is corroborative. How about this $10,000 transaction? I'm so glad Your Honor raised that because it is a critical issue in this case, and I know the government relies very heavily on it with respect to, you know, the lead issues for us in this case, which are, you know, the appropriateness, what we regard as the inappropriateness of the money laundering, the willful blindness instruction and our suggestion to the court that there is insufficient evidence of money laundering as a matter of law. So the government relies heavily on what Judge Floyd just cited as the $10,000 transaction, where Foreman writes a check to Farrell for $10,000 in exchange for cash, $10,000 in cash. The government says this is evidence of Farrell's guilty knowledge of the crime of money laundering at the time, and it is no such thing. I submit to Your Honor that that proposition, the notion that that exchange of $10,000 in cash for a $10,000 check vis-a-vis Mr. Foreman, it is utterly illogical to suggest that that transaction provides anything close to sufficient fodder under either of those two standards, the standards for administration of a willful blindness instruction or the standard for the or whether or not there's sufficient evidence of money laundering. And that's for the following reason, because money laundering, the crime of money laundering at its root, fundamentally, and this is under both of those two standards, is predicated upon the notion that the funds are tainted, that the funds come from an illegal source. Well, what in the world would be accomplished from that standpoint by engaging in this transaction, which occurs in May of 2010 between Farrell and Foreman? There's absolutely no, if the funds, and of course, what the evidence in this case shows is that Farrell did what criminal defense lawyers do, that he basically sort of suspends judgment. I mean, criminal defense lawyers are representing guilty individuals all the time. That's our job. I mean, we represent guilty individuals, and sometimes we're lucky enough to represent an innocent one. But when you do that, you essentially suspend judgment. It's not like you know. I note that my light's turned red. May I continue, Your Honor? You can close it up. I appreciate that very much. But you can go ahead. No, thank you so much. You don't have to stop mid-sent. Thank you. So essentially what Farrell is doing during the course of his interaction with all these individuals is he is essentially suspending judgment in terms of whether or not there is guilt here, whether there is a conspiracy or there isn't. But if his objective in engaging in this transaction with Foreman is to engage in money laundering, to essentially conceal the source of funds he's received, this would be the worst, most illogical, nonsensical way of going about it, because there's absolutely no reason to believe that, I mean, Foreman was the first one the government sought to interrogate with respect to this conspiracy. If funds are tainted, why would anyone believe that that $10,000 isn't tainted, be it via a check or be it via cash? So it accomplishes nothing, and it suggests no guilty knowledge, and it doesn't meet either or any of the prongs with respect to willful blindness or with respect to money laundering. Thank you so much. I've been very patient with you. Certainly. Thank you, Your Honor. Ms. Wilkinson? May it please the Court. I would like to start here with the proposition mentioned earlier, which is that it's the government's position that Mr. Farrell was the consigliere of a large, multimillion-dollar marijuana organization. And that is indeed true. But it is equally true that Judge Titus also found and agreed that was exactly Mr. Farrell's role in this particular marijuana and money laundering conspiracy. And more importantly, it was Mr. Farrell's own words that give us his role as the consigliere of this organization, because to answer many of the questions that are raised by the defendant in his brief is to look at that recording with Mr. Foreman in July of 2012, because it gives virtually an element of what is important in connection with the legal issues raised in this case. And I'll start with Judge Thacker's questions about this proffer agreement, Judge King's questions about this proffer, this statement by Mr. Farrell, just go in and tell the government everything, only what you think that they know. Again, in isolation, Mr. Kober makes a legal argument, a nice technical, nice little legal argument, but you have to look at it in the context of when it was said in July of 2012. And when I read it, first of all, Your Honor, Mr. Farrell explains to them that it was in connection with a proffer agreement. He uses the word proffer agreement. He tells Mr. Foreman when you go in there with the benefit of a proffer agreement. And then he goes on to tell him that he's at risk, meaning Mr. Farrell's at risk, and that you don't – and how does he say it? I know I don't know, but I'm at risk, because you know I know everything. I know all the people that were in trouble. I know what's going on with the case. He's the one that said he has to protect the family. These are – this is statements that Mr. Farrell made in the connection with a conversation with a former client who he knew was represented by a new client. And even to put the icing on the cake here, Your Honor, at the end of the day, he's going to get him some money, some cash, and he's going to pay that attorney's fees back. Can you address the money laundering issue? Because I think that might be the weakest point for the government. Yes, and I understand, Your Honor, I was up here to talk – are you talking about the deliberate – the wolf of blindness argument? Yes. First of all, that issue comes before the court on abuse of discretion standard. Did Judge Titus abuse his discretion in giving a willful blindness argument in this particular case? It is clear that there is circumstantial evidence all over from 2009, continuing up until that July of 2012 meeting between Mr. Farrell and Mr. Foreman, of a pattern of activity that shows circumstantial evidence that Mr. Farrell had actual knowledge that not only were the proceeds of drug trafficking being used to pay for these attorneys – I mean, the attorneys to represent people who worked for Mr. Farrell, for Mr. Nika – but also to provide commissary funds for another inmate who was in prison. So that's what Mr. Farrell did. He had his hands in five different people who worked for Mr. Nika, at least five. That was the evidence at trial. And specifically on that $10,000, what was the government's best evidence that that $10,000 were proceeds of unlawful activity? Well, Your Honor, first of all, the nature of the transaction itself, right? So we're dealing here with – Where did he get the money? Where did he get the money? You didn't prove it. Well, Your Honor, if you look, we proved that he had over $100,000 in cash put into his legitimate law firm accounts for which he attributes that money to certain clients, but he does not put in the source of that money because it is Mr. Nika's and the marijuana organization that he's attempting to conceal the source. Where did the $10,000 come from? It comes from the cash that came out of wherever. I mean, that's part of the evidence in this case, Your Honor. Why would an attorney get a $10,000 check and in Mr. Foreman's own words, so he could – I mean, in Mr. Farrell's own words, so he could show on the books that he's been paid when, in fact, he hasn't been paid, right? Because the $10,000 were coming. He gave the $10,000 cash back to Mr. Foreman to show he's been paid by who? By Mr. Foreman? Mr. Foreman didn't pay him now because he's giving back the $10,000. And that's just one aspect of this because, remember, that all happens in July. We have what happened with the other clients earlier on as Mr. Farrell proceeds through this timeframe when he is putting his hands in all of these different particular clients that he doesn't represent, but he knows are being charged with one thing in common, being involved in this marijuana conspiracy. And we have to go back to – What was your theory on who his client or clients were? Pardon me, sir? What was the government's theory on who his clients were? Well, the government certainly contends that Mr. Nika – the evidence would show that Mr. Nika was the person who Mr. Farrell had the closest relationship with. I don't think there can be any dispute about that. But there is some, quote-unquote, ambiguity about who he represented. He says he was working in the interest of the family. So whether or not that's Mr. Nika, who was the head of the organization, or the more esoteric – not the LLC, but the marijuana business itself, who knows? The organization? The organization itself. Exactly, Your Honor, because all of – I mean, I know it's not a regular organization, but certainly all of the people that testified in this trial link Mr. Farrell over that time to the fact that they have one thing in common, and that is they all worked for Mr. Nika. And I think it's very telling that Mr. Farrell stayed in contact with Mr. Nika after the indictment of Mr. Nika, but while he was a fugitive in Canada. And he's able to get him on the line and get information to make sure that Mr. Nika knows what's going on, just like Mr. Farrell wants to make sure he knows what's going on because he's at risk. Did Farrell testify to the trial? No, he did not, Your Honor. I was not trial counsel, but he did not testify at trial. Well, you said what he said. That's the reason I'm – Oh, it's coming from what other witnesses testified that he said. And most of – all of the evidence in this case, besides the recording itself – He did testify because the recording. He had recordings that they – some of them went in there. The recordings in July are so – they're so powerful and so compelling, and frankly, as you can see from the way the conspiracy is charged from 2009 to July of 2012, it was the government smoking gun. Let me ask you about the attorneys who testified. It's my impression they were offered as lay witnesses as opposed to expert witnesses. Absolutely, Your Honor. They were there as fact witnesses, right? They were there to testify about the context in which they represented their clients and what was happening around these receipts of money and things that Mr. Farrell was doing and saying. They were just lay witnesses. The court has – So it was all lay testimony? Yes, Your Honor. There was no – They weren't experts? No, there was not – Well, there were questions about – They could have been probably – There were questions about what lawyers do or what they shouldn't do. Well, some of them were asked by the defense, and I think, you know, that's a double-edged sword here. A lot of the issues that they have raised are in connection with redirect questions that – You said that – so you're saying that he represented NICA and the organization? I think there's evidence in the record to show that his interests were aligned with Mr. NICA and the organization. And these other folks that he was talking to, he didn't really represent? He was just – Well, lawyers can have multiple clients. Not if they're conflicted, Your Honor. Well, they might have conflicts. But you don't – it's not a crime for a lawyer to have conflicts. That's not – That's an ethics violation. It might be disbarred. But here you're putting him in penitentiary. I 100 percent agree. Well, so is the fact that a lawyer has a conflict of interest violate one of these statutes that you indict him under? No, Your Honor. It's just one fact. Okay. That's what I thought. So he could have multiple clients. If he had – And it might be a violation if he went to court with them all. Some judge may say, you can't represent everybody here today. 100 percent. But, again – Because they're going to get their own client, get their own lawyer. But he might have. And he might have had ethics problems and was acting that way. But he chose not to do that. He didn't enter his appearance for Ms. Mitchell. He didn't enter his appearance for Mr. Consolino. Maybe he co-counseled with these other people. He didn't. There's no evidence that they were co-counseled. The attorneys testified. I mean, we can go round and round. It's certainly a fact, just like the other facts. Communication, for example, with a representative party. That's not a crime either. I've represented defendants in criminal cases. I mean, the lawyer's got to be careful. I've had – I've probably been on seminars where I've told them that perhaps the most dangerous person that they're dealing with in a criminal case is their own client. They've got to be very careful. Well, I think that – But that doesn't mean everything they do is criminal. Of course not. Because they're representing a criminal defendant. Of course not. I mean, that goes to the heart of everything that we all do in the criminal justice system. This is taking things, looking at the big picture, and each of these little facts for an experienced criminal defense attorney and weighing them in the context of his words in July of 2012 and the way that he conducted these financial transactions. If the Court has any further questions for me, I'll – Thank you, Ms. Wilkins. Thank you. Mr. Coburn? Thank you so much, Your Honor. What just happened here in response to Judge Thacker's question to the government is exactly what happened below. The requisites for the administration of a willful blindness instruction are – they're technical, and they are meant to be construed strictly. There's all kinds of case authority cited in our brief and cited in particular in the National Association of Criminal Defense Lawyers brief about how discouraged the use of this instruction is. There are places where it's essentially prohibited. I believe the Third Circuit. And there's a good reason for that because, you know, it – I mean, the case law – and this is just not me saying this,  has the functional effect, essentially, of taking what is an outright, unambiguous, subjective knowledge requirement and dropping it down to what could be construed sometimes as something close to negligence. And so to follow up on what Judge Thacker said, I mean, there are specific requirements for when an instruction like this can be administered. There has to be a high probability of a relevant fact existing and that the defendant – and this is critical – took, quote, unquote, to avoid confirming that belief. That's from Global Tech. And it's been affirmed in a whole series of other cases. There's no dispute about the fact that that's the rubric. That's what applies here. There can't be any serious – In the final analysis, though, it's a question of the exercise of discretion by the trial judge. Well, as a fundamental – And the same thing for your Allen charge. You claim they gave an Allen charge here. And that's a review for abuse of discretion, too. That, I think, is clearly a review of abuse of discretion. With respect to this issue – You don't think this is an abuse of discretion issue? Well, as an overall matter, the decision to instruct or not to instruct in a particular manner is reviewed for abuse of discretion. But if inside of that analysis there is a misunderstanding of the law, which we think is the case here, then that could be reviewed, at least with respect to that sub-issue, could be reviewed de novo. And here, with respect to that standard – The judge didn't understand what he was doing? Well, I wouldn't say that about Judge Titus, Your Honor. I have the – That's what you have to argue. Well, I've got the highest regard for Judge – A legal error can – I think he – Isn't an abuse of discretion. I think he made an error when he instructed this jury with respect to willful blindness in a situation in which the requisites, the ones I just referred to, including the requirement of a showing of affirmative steps to avoid knowledge, there's a complete vacuum, a complete, utter absence of proof in this record of that. There's no evidence of it, none. There can't – From my standpoint, there just can't be an argument. An argument, anything close to a successful argument, cannot be presented to the effect that a willful blindness instruction was appropriate here. And when Judge Thacker put that question to the government, the government responded the way they did below, the way they have throughout this case. They responded by saying, well, there's actual knowledge. But that's not the answer because the presence of actual knowledge has nothing to do with whether or not – They could argue in the alternative, too. They could argue in the alternative, although there is at least one case out there suggesting that that's impermissible. But our point here is that there is a complete absence of a basis for a willful blindness instruction, and it can't be harmless because as a matter of law, the requisites for demonstrating actual subjective knowledge and the other requirements with respect – But everything in these cases can be harmless. I mean, we've got a lot of harmless error cases where we found error and say it really didn't – there was plenty of evidence to convict anyway. Oh, I don't doubt that for a moment, Judge King. But my point here – Rule 52 says it can be harmless. Well, certainly error can be harmless, but here we're talking about something that's at the very heart of this case. Constitutional error can be harmless. It could be, but it's much more difficult for it to be harmless. And here what we're talking about is something that's at the very heart of this case. As Judge Thacker pointed out, it's the government's weakest argument, this notion that a willful blindness instruction could have applied. So if they weren't entitled to that instruction, which I think it's clear on the record, that's what Mr. Farrell got convicted on, got convicted because of the willful blindness instruction, because there's just no evidence. There's just no evidence in this case that he had actual subjective knowledge. He did what criminal defense lawyers do, which in this situation is you don't form a judgment. You don't look. You don't do your own investigation. You mean there's no evidence that he had actual knowledge? There's no evidence that he had subjective actual knowledge that the funds that were utilized, the funds that he touched, were tainted. There's evidence in this case, uncontested evidence in this case, coming from the government's own witness, Mr. Foreman, to the effect that even if the funds that issue, and, of course, as the Court pointed out, we don't know where the money came from that Mr. Farrell dispensed to Mr. Brown or to Mr. Tully. We don't know. But even if that money, even if that money came, let's say, from Mr. Nika or, you know, from the quote-unquote conspiracy, there's evidence in this case that there were a number of licit, of legal, sources of funds that were available to these people, that there was a casino. This is at Appendix 1797 through 1782, I believe, or 1797 for the next couple of pages. It says this is Foreman's testimony to the effect that there were legal sources of funds, casino, real estate, and so on, some of which Foreman actually facilitated. So there's no evidence, zero. There's no evidence of actual knowledge or of the other requisites for a money-laundering conviction. You're running that red light again. I know. Thank you so much. I appreciate it very much. Thank you, Mr. Coburn. We'll come down to Greek Council and then call the last case. Yes. Mr. Coburn, I understand you're court-appointed here. Yes. And we appreciate your work. We couldn't do it without you. Thank you.
judges: Robert B. King, Henry F. Floyd, Stephanie D. Thacker